AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California  ▼

| | | | |
|---|---|---|---|
| In the Matter of the Search of | ) | | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | Case No. | '22  MJ3847 |
| black Apple iPhone cellular telephone IMEI number 352896113380567 | ) ) ) ) | | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 USC 1324 | Transportation of Illegal Aliens, Conspiracy to Transport Illegal Aliens |

The application is based on these facts:

See  attached affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Border Patrol Agent Manuel J. Cervantes
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means)*.

Date:  ___10/18/2022___

_____
*Judge's signature*

City and state: San Diego, California

Hon. Karen S. Crawford, US Magistrate Judge
*Printed name and title*

## ATTACHMENT A

The item to be searched is a Black iPhone cellular telephone, with IMEI number 352896113380567, seized from Everardo Godina Jr. on September 7, 2021. The cellular telephone is currently in the possession of the Customs and Border Protection Asset Forfeiture Office, 3752 Beyer Boulevard, San Diego, California 92173.

ATTACHMENT B

The items to be seized are evidence of violations of Title 8, United States Code, Section 1324 (transportation of illegal aliens and conspiracy to transport illegal aliens), located on a black Apple iPhone cellular phone, with IMEI number 352896113380567, for the period from June 1, 2021, to September 7, 2021, limited to communications, records, or data including emails, text messages, photographs, audio files, videos, applications, call logs, contact lists, and/or location data:

    a.    tending to indicate efforts to smuggle undocumented aliens from Mexico to the United States or smuggle undocumented aliens further into the interior of the United States;

    b.    tending to identify other facilities, storage devices, or services such as email addresses, IP addresses, phone numbers that may contain electronic evidence tending to smuggle undocumented aliens from Mexico to the United States or smuggle undocumented aliens further into the interior of the United States;

    c.    tending to identify co-conspirators, criminal associates,   or   others involved in smuggling illegal aliens from Mexico to the United States or smuggling undocumented aliens further into the interior of the United States;

    d.    tending to identify travel to or presence at locations involved in smuggling undocumented aliens from Mexico to the United States or smuggling undocumented aliens further into the interior of the United States, such as stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the subject phone; or

    f.     tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.

**AFFIDAVIT**

I, Manuel J. Cervantes, a United States Border Patrol Agent ("BPA") with the United States Border Patrol ("USBP"), Customs and Border Protection, Department of Homeland Security, having been duly sworn, hereby state as follows:

1.  I make this affidavit in support of an application for a search warrant in furtherance of an alien smuggling and transportation investigation conducted by USBP agents for the following target property:

> (1) Black iPhone cell phone, IMEI: 352896113380567 (hereinafter referred to as "**Target Telephone**")

seized from Everardo GODINA JR ("GODINA") on September 7, 2021.

2.  The **Target Telephone** was seized from GODINA on September 7, 2021, at the time of his arrest. The **Target Telephone** was used by GODINA to communicate with Gabriel Daniel ARCHULETA and Jose Alfredo PENALOSA JR, during an alien smuggling and transportation event in the Southern District of California, in the Otay Mountain Wilderness Area. Probable cause exists to search the **Target Telephone** as it contains evidence relating to violations of Title 8, United States Code, Section 1324 Transportation of Illegal Aliens and Conspiracy to Transport Illegal Aliens.

3.  The **Target Device** is currently in the possession of the Customs and Border Protection Asset Forfeiture Office, 3752 Beyer Boulevard, San Diego, California 92173. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

4.  Based upon my experience and training, and conversations with other agents involved in investigating alien smuggling and transportation or computer forensics, and all the facts set forth in this Affidavit, I submit this Affidavit in support of the application to search the **Target Telephone** for and to seize, as it pertains to

violations of 8 U.S.C. § 1324, Alien Smuggling and Transportation and Conspiracy to Smuggle and/or Transport Aliens, communications, records, or data including but not limited to emails, text messages, photographs, audio files, videos, applications and/or location data:

    a.    tending to indicate efforts to smuggle undocumented aliens from Mexico to the United States or smuggle undocumented aliens further into the interior of the United States;

    b.    tending to identify other facilities, storage devices, or services such as email addresses, IP addresses, phone numbers that may contain electronic evidence tending to smuggle undocumented aliens from Mexico to the United States or smuggle undocumented aliens further into the interior of the United States;

    c.    tending to identify co-conspirators, criminal associates, or others involved in smuggling or transporting illegal aliens from Mexico to the United States or smuggling or transporting undocumented aliens further into the interior of the United States;

    d.    tending to identify travel to or presence at locations involved in smuggling or transporting undocumented aliens from Mexico to the United States or smuggling or transporting undocumented aliens further into the interior of the United States, such as stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the subject phone; or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.

## EXPERIENCE AND TRAINING

5.    I am a BPA with the USBP within the Department of Homeland Security ("DHS"). I have been employed as a BPA since July 26, 2010. I am presently assigned to the Targeted Enforcement Unit (TEU) at the Brown Field Border Patrol Station. I am a graduate of the United States Border Patrol Academy at the Federal Law

2

1  Enforcement Training Center (FLETC) in Artesia, New Mexico. I have received basic
2  and advanced training in investigating alien smuggling, identifying immigration
3  violations, and enforcing numerous immigration and customs laws within the United
4  States.

5      6.      As a BPA, I am a Federal Law Enforcement Officer within the meaning of
6  Rule 41(b) of the Federal Rules of Criminal Procedure, that is, a government agent
7  engaged in the enforcement of the criminal laws of the United States, and thereby
8  authorized to request issuance of federal search and seizure warrants. As an agent with
9  the Border Patrol, my responsibilities include the investigation of possible violations of
10  Immigration and Nationality laws (Title 8, United States Code), including alien
11  smuggling and transportation in violation of Title 8, United States Code, Section 1324,
12  and related offenses.

13      7.      My past duties with the USBP include patrolling the United States/Mexico
14  border to prevent the entry of aliens or contraband, and to arrest those who are in
15  violation of immigration law or any other applicable federal or state law. During my
16  time on patrol duties, I was involved in preparing and submitting cases, reports and
17  evidence for administrative and criminal proceedings regarding immigration law and
18  state violations.

19      8.      From October 2017 to the present day, I have been assigned to a plain
20  clothes enforcement unit. The duties of this unit include developing criminal cases
21  against alien smugglers and other members who held different roles within criminal
22  smuggling and transportation organizations. I have conducted surveillance on static
23  and mobile targets in plain clothes and while operating unmarked vehicles. I have
24  worked on open investigations, developing target files, writing administrative
25  subpoenas, and developing leads on suspects.

26      9.      Through the course of my career, I have arrested and interviewed
27  numerous alien smugglers. Through these experiences, I have become familiar with the
28  activities of those who coordinate smuggling and transportation events and the practices

used for the drivers/smugglers they employ locally and abroad, including transportation methods and tactics used to communicate with the drivers and avoid detection by law enforcement.

10.     In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in investigating alien smuggling and transportation and the forensic examination of cellular phones, and the opinions stated below are shared by them.  Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit.

11.     Based upon my training and experience, and consultations with law enforcement officers experienced in alien smuggling and transportation investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

> a.     Alien smugglers will use cellular telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.
>
> b.     Alien smugglers will use cellular telephones because they are able to actively monitor the progress of the aliens while they are in transit.
>
> c.     Alien smugglers and their accomplices will use cellular telephones because they can easily arrange and/or determine what time the aliens will arrive at predetermined locations.  This is accomplished using telephone calls, text, web, and voice messages.
>
> d.     Alien smugglers will use cellular telephones to direct drivers to synchronize an exact drop off and/or pick up time of the aliens.
>
> e.     Alien smugglers will use cellular telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

4

f.    Alien smugglers and their co-conspirators often use cellular telephones to communicate with load drivers who transport the aliens.

12.    This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

a.    tending to indicate efforts to smuggle aliens from Mexico into the United States;

b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c.    tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d.    tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e.    tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

13.    This account of the circumstances surrounding the arrests of Gabriel Daniel ARCHULETA, Kayla Yovanna Godina, Everardo GODINA Jr. and Jose Alfredo PENALOSA Jr. for violations of Title 8 United States Code 1324 (alien smuggling and transportation and conspiracy to smuggle or transport aliens) is based on my review of the reports and records of this case, including U.S. Department of

5

Homeland Security Report of Investigation Form: G166F # BRF2109000201.

14.    On Tuesday, September 7, 2021, BPA Jose Meza, BPA George Artiles, BPA Heriberto Soto and Supervisory Border Patrol Agent (SBPA) John Q. Duncan were performing line watch operations in their assigned areas of responsibility, in the Otay Mountain Wilderness area a few miles north of the border.  BPA Meza, BPA Artiles, BPA Soto and SBPA Duncan were wearing full Border Patrol rough duty uniforms with all agency patches and badges clearly visible, identifying them as United States Border Patrol Agents. This area where the agents were patrolling is commonly used by undocumented persons attempting to further their illegal entry into the United States due to the mountainous terrain and lack of infrastructure that would allow Border Patrol Agents to quickly respond to illegal entries and access to Otay Lakes Road and State Route 94 (SR-94), paved routes of egress away from the border.

15.    At approximately 10:45 PM, BPA Meza was driving south, going up on a one-way road known to Border Patrol Agents as the "Minnewawa." This area is located approximately five miles north of the international boundary between the United States and Mexico, and approximately six miles east of the Otay Mesa, California Port of Entry. As BPA Meza was traveling up the Minnewawa, he encountered three vehicles driving north down the mountain together.  The vehicles were a black Polaris ATV (CA/BL1C70), a white Ford F250 (CA/70608V2) with a smaller ATV on the truck bed, and a black Jeep Wrangler/Rubicon (CA/ELJOTAR).  BPA Meza approached the Polaris and identified himself as a Border Patrol agent.  BPA Meza observed a male driver, later identified as Gabriel Daniel ARCHULETA, a front seat female passenger, later identified as Kayla Yovanna Godina (sister of Everardo GODINA), and two young children in the back seats.  BPA Meza asked ARCHULETA where he was coming from, and he stated, "I was at the top of the mountain riding my Polaris with my family." BPA Meza then asked ARCHULETA if all three vehicles were traveling together, to which ARCHULETA stated they were.

16.    After speaking with ARCHULETA, BPA Meza approached the second

6

vehicle, the white Ford F250. At first, the driver would not roll his window down. BPA Meza had to knock on the door and the driver cracked open the window where BPA Meza could only see him from his eyes up.  BPA Meza asked the driver, later identified as Jose Alfredo PENALOSA Jr., to lower the window and PENALOSA loudly and aggressively said, "No!" BPA Meza then notified agents, via Department of Homeland Security (DHS) service radio, that he needed back up as he was by himself and had several individuals driving off-road style vehicles. BPA Meza notified agents he believed this group of off-roaders may be involved in criminal activity.

17.   Upon hearing Meza requesting back up, PENALOSA said he would come out of the white Ford F250 he was driving. PENALOSA then opened the door, exited the truck and stepped away from BPA Meza.  When PENALOSA opened the door and exited the truck, BPA Meza observed what he thought were individuals laying down in the back seat area of the truck, in an attempt to conceal themselves.  From BPA Meza's training and experience in the Border Patrol, vehicles smuggling or transporting illegal aliens often attempt to conceal undocumented individuals in this manner. Due to this observation, BPA Meza opened the rear driver side door and observed six individuals lying down, stacked on top of each other.

18.   PENALOSA saw that BPA Meza had observed the individuals lying in the back and PENALOSA immediately began to back away from BPA Meza and the truck. BPA Meza yelled for PENALOSA to stop and come toward him. PENALOSA yelled, "No" and ran to the other side of the truck.  BPA Meza told the individuals in the truck not to move and BPA Meza shut the door to the vehicle.  BPA Meza ran to the other side of the white Ford F250 to detain PENALOSA, but PENALOSA ran further away from BPA Meza and the truck. PENALOSA then walked towards Kayla Godina, the passenger in the Polaris. BPA Meza observed PENALOSA give Kayla Godina something and then he tossed his hat into the Polaris. BPA Meza told him not to run and that it would only make things worse. PENALOSA again yelled, "No" and started running away.

7

19.     BPA Meza notified agents, via DHS service radio that PENALOSA was absconding, running north away from him. To keep the scene safe and maintain control of the individuals there, BPA Meza did not immediately give chase to PENALOSA. ARCHULETA and Godina said to BPA Meza, "Actually we do not know him, we just met him at the top of the mountain. We have no clue who he is or what he was doing." BPA Meza asked ARCHULETA what PENALOSA said to them and what he gave them. ARCHULETA and Godina insisted that he did not say anything to them and that he only threw his hat into the Polaris. ARCHULETA and Godina told BPA Meza "We do not want to be implicated with that individual because we have our kids and need to get them home." BPA Meza told them he understood that they needed to get home but because something was thrown into the vehicle, BPA Meza needed to find out what it was.

20.     BPA Meza told ARCHULETA and Kayla Godina to remain in the vehicle, and they complied. When additional agents arrived at BPA Meza's location, some began to search for PENALOSA, and others helped BPA Meza detain the individuals and safely secure the scene.

21.     BPA Meza used his service radio to request record checks on the white Ford F250. While BPA Meza was waiting for the results of the record checks for the white Ford F250, BPA Meza approached the third vehicle, a black Jeep Wrangler/Rubicon. BPA Meza observed one male individual in the Jeep, later identified as Everardo GODINA Jr. When Meza approached the black Jeep, Everardo GODINA, stated "I do not know what is going on" and falsely claimed he not know any of the people in the other stopped vehicles. When BPA Meza asked Everardo GODINA what he was doing on the mountain, GODINA said, "I was just up there." BPA Meza asked him to explain. GODINA said he was driving his Jeep and got a flat tire. GODINA stated he asked the individuals in the vehicles ahead of him for help, and they provided assistance and they were all coming down the mountain to go home. BPA Meza instructed GODINA to remain in the Jeep. BPA Meza then requested record

8

1  checks on the Jeep and Everardo GODINA.

2    22.    BPA Meza asked ARCHULETA and Kayla Godina for identification and
3  they both stated that they did not have any. They continued to request that BPA Meza
4  allow them to leave because of the children. BPA Meza informed them that he was not
5  allowing them to leave until they were properly identified, so they could be cleared of
6  any wants and/or warrants and of any involvement in the alien transportation event.
7  Shortly after explaining this to ARCHULETA and Kayla Godina, they found and
8  presented their identifications.

9    23.    Record checks revealed ARCHULETA had prior alien smuggling charges,
10 was currently on probation for those alien smuggling charges and had a possible warrant
11 for these charges. The warrant was later discovered to have been cleared.  BPA Meza
12 placed ARCHULETA in an investigative detention and placed him in back seat of his
13 agency vehicle. Prior to placing ARCHULETA in handcuffs, BPA Meza saw him give
14 his cellular phone to his girlfriend, Kayla Godina. BPA Meza asked Kayla Godina to
15 drive the Polaris ATV down Otay Mountain. She asked Meza if her brother, who she
16 identified as the driver of the black Jeep behind them (GODINA), could drive the
17 Polaris instead.  This was the first time that BPA Meza became aware of the nature of
18 the true relationship between the occupants of the Polaris and the black Jeep. Gabriel
19 Daniel ARCHULETA, Kayla Yovanna Godina and Everardo GODINA Jr. were
20 transported with the six illegal aliens to the State Route 94 checkpoint in Jamul,
21 California for processing and booking.

22    24.    At approximately 2:00 AM, BPA Soto broadcasted over the DHS service
23 radio that he had visual of the driver, previously identified as Jose Alfredo PENALOSA
24 Jr., of the white Ford F250 that had absconded from agents earlier in the night. SBPA
25 Duncan responded to the area with BPA Artiles.  Upon arriving to the area, the agents
26 responding requested the type of foot-sign associated to the individual that
27 absconded.  Foot-sign is what characterizes the type of footwear the individuals being
28 tracked have on or are using.  Border Patrol Agents use this sign to track individuals in

9

1 the rural areas of eastern San Diego and this assists them in staying in line with the
2 groups they are tracking.

3       25.    Both SBPA Duncan and BPA Artiles were verbally guided by BPA Soto
4 to the location where PENALOSA was hiding in the thick brush. As BPA Artiles
5 approached PENALOSA's location, PENALOSA began to run uphill away from both
6 agents. SBPA Duncan ran uphill and was able to get ahead of PENALOSA.

7       26.    SBPA Duncan caught up to PENALOSA and identified himself as a
8 Border Patrol Agent and placed him in handcuffs at approximately 2:21 a.m. SBPA
9 Duncan advised PENALOSA he was under arrest for 8 USC 1324, Alien
10 Smuggling. As BPA Artiles was searching PENALOSA, he checked the bottom of his
11 shoes and noticed it was the same type of foot-sign they had been tracking. SBPA
12 Duncan and BPA Artiles walked PENALOSA back to their vehicles and transported
13 PENALOSA to the Brown Field Border Patrol Station for further processing and
14 booking. While conducting a search of PENALOSA's person, agents discovered a
15 black iPhone cellphone in his pants pocket.

16       27.    On September 7, 2021, at approximately 8:19 PM, PENALOSA was re-
17 interviewed by BPAs Cervantes and Garza, after having been previously advised of his
18 Constitutional rights and waived them. PENALOSA was asked if he still remembered
19 his Miranda Rights and advised they still applied during his interview. PENALOSA
20 stated he still remembered his Miranda Rights advisal and was willing to speak with us
21 without an attorney present. PENALOSA was asked and gave both verbal and written
22 consent to a search of his cellular phone. PENALOSA stated he works for "Gabriel's,"
23 referring to a towing company operated by Gabriel Daniel ARCHULETA. PENALOSA
24 said he has known ARCHULETA since 2016. PENALOSA stated he attended
25 Sweetwater High School and ARCHULETA attended Lincoln High School and had
26 mutual friends together. PENALOSA stated he has known "Kayla," referring to Kayla
27 Yovanna Godina since 2018 and knows her through ARCHULETA. PENALOSA
28 stated he is not friends with her personally but knows her and ARCHULETA are

together as a couple, and they have two children together.

28.    PENALOSA stated he has known "Everardo," referring to Everardo GODINA Jr. for approximately one year and met him through ARCHULETA. PENALOSA stated Kayla Godina and Everardo GODINA are siblings. PENALOSA stated ARCHULETA and Kayla Godina reside together in El Cajon, CA.

29.    PENALOSA stated that late in the evening on Sunday, September 5, 2021, he started receiving phone calls from telephone number 619-707-1394, which he did not answer. PENALOSA stated the following morning at approximately 11:00 a.m., (Monday, September 6, 2021), he began receiving calls from that same number but again did not answer. PENALOSA stated he finally answered the calls at approximately 3:00 p.m. and realized it was ARCHULETA calling. PENALOSA stated ARCHULETA told him he needed to get ready because there was some work that needed to be done. PENALOSA stated he assumed ARCHULETA meant towing vehicles, so he told ARCHULETA to tell the tow customers to wait because he was currently on Coronado Island with his sister and was not available at that moment. PENALOSA stated he told ARCHULETA he would be available to work in a few hours.

30.    PENALOSA stated that at approximately 6:00 p.m., ARCHULETA called him and told him to meet him at his mother's residence in Encanto. PENALOSA stated he drove to ARCHULETA's mothers house and ARCHULETA was waiting outside the residence getting the off-road vehicles ready. PENALOSA stated the Ford F-250, with the small Polaris in the bed used to transport the undocumented aliens (UDA's) was present at the residence as well as the tow truck with the larger 4-seat Polaris on it. PENALOSA stated the tow truck belongs to ARCHULETA and the F-250 belongs to ARCHULETA's family. At the residence, PENALOSA stated ARCHULETA told him the job was not about towing vehicles but instead it consisted of picking up UDAs on Otay Mountain. PENALOSA stated he was apprehensive about accepting the offer but in the end he agreed. ARCHULETA stated it was Labor Day and there would be a lot

11

of civilians on the mountain, and it would be easy to blend in. PENALOSA stated ARCHULETA told him there was twelve UDAs that needed to get picked up and he would get paid a sum of $500 USD per UDA. PENALOSA stated that while he and ARCHULETA were talking, Kayla Godina and the two kids were already inside the tow truck ready to leave. PENALOSA stated they left the residence at approximately 7:00 p.m. and drove to the Pio Pico Campground at the base of Otay Mountain. PENALOSA stated he drove the F-250, while ARCHULETA, Kayla Godina and the two kids rode in the tow truck. PENALOSA stated ARCHULETA drove with the larger 4-seat Polaris, while he had the smaller Polaris in the bed of the F- 250.

31.     PENALOSA stated they arrived at the Pio Pico Campground between the hours of 7:30 p.m. and 8:00 p.m. Once there, PENALOSA stated Everardo GODINA was already waiting in the black Jeep. PENALOSA stated Everardo GODINA had his dog with him in the Jeep. PENALOSA stated all of them helped unload the larger 4-seat Polaris and once they did, they all drove up the mountain. PENALOSA stated ARCHULETA, Kayla Godina and the two children rode in the 4-seat Polaris, while Everardo GODINA drove the black Jeep. PENALOSA stated he drove the F-250 by himself. PENALOSA stated they drove all the way up to the old-World War II bunkers at the top of Otay Mountain (referring to what is known to BPAs as "Bunkers" on the Otay Mountain Truck Trail).

32.     PENALOSA stated once at the Bunkers, ARCHULETA, Everardo GODINA and himself formulated the plan to pick up the UDAs. PENALOSA stated ARCHULETA was in communication with someone known only as "Jetty." Jetty was telling ARCHULETA where the UDAs were walking up to on the mountain. A later review of the pone seized from PENALOSA revealed that Jetty was listed as a phone contact in PENALOSA's cell phone with phone numbers of 714-659-7923 and 714-610-1053. PENALOSA stated that while they were discussing the plans, Kayla Godina was sitting in the 4-seat Polaris with her two children not far from them. PENALOSA stated he was unsure if she heard the plans but assumed she was aware that they were

12

1 there to pick up the UDAs.

2      33.    PENALOSA stated that once the plan was formulated, he started regretting

3 his decision. PENALOSA stated he was told by ARCHULETA that he would be

4 loading all twelve UDAs inside the F-250 with him. PENALOSA stated he was scared

5 and only wanted to load six and asked if the other six could ride with Everardo GODINA

6 inside the Jeep. PENALOSA stated both ARCHULETA and Everardo GODINA said

7 no and told him he needed to take all twelve by himself. PENALOSA stated he then

8 suggested to ARCHULETA and Everardo GODINA that they should try to pick them

9 up the next day, but Everardo GODINA said no because he had to work on Tuesday.

10 PENALOSA stated they finally agreed to only pick up six and the rest would be picked

11 up later.

12      34.    PENALOSA stated he began to drive to the pickup location, (GPS

13 coordinates provided by PENALOSA as 32.58367, -116.84940), while ARCHULETA,

14 Kayla Godina along with their two children drove north of that area to block traffic

15 north on the Otay Mountain Truck Trail. PENALOSA stated Everardo GODINA drove

16 south on the Otay Mountain Truck Trail to an area known to BPAs as the "80 Helo Pad"

17 to block traffic south on the Otay Mountain Truck Trail.

18      35.    Once at the GPS coordinates, PENALOSA stated he yelled out "Jesus" and

19 the UDAs ran out from the bushes near the Otay Mountain Truck Trail. PENALOSA

20 stated he yelled out "Jesus" because that was the name of the foot-guide in the group. It

21 should be noted a foot-guide is human smuggler that guides UDAs from Mexico into

22 the United States. Once the UDAs were in the vehicle, PENALOSA stated they all

23 began to drive out of the area towards the Pio Pico Campground. PENALOSA stated

24 ARCHULETA, Kayla Godina and the children were driving in front, he (PENALOSA)

25 was driving in the middle with the six UDAs in the F-250 and Everardo GODINA was

26 driving in the rear with the Jeep.

27      36.    PENALOSA stated they drove down passing two Border Patrol marked

28 service vehicles along the way and were subsequently encountered by a third Border

Patrol vehicle. PENALOSA stated the BPA first approached and talked to ARCHULETA and Kayla Godina but he could not hear what the agent was saying to them. PENALOSA then stated the BPA approached him in the vehicle and subsequently found the UDAs inside. PENALOSA stated the BPA ordered him to get out of the vehicle, but he began to walk away from the BPA in attempt to elude arrest.

37.    PENALOSA stated he walked over towards ARCHULETA in the Polaris and stated that ARCHULETA told him "Run fool!" PENALOSA stated he tossed ARCHULETA his hat and began running away from the BPA. PENALOSA stated he ran down the mountain and his intention was to walk to the Pio Pico Campground so that he could call someone to pick him up. PENALOSA stated he ran down the mountain evading the Border Patrol through the thick brush and rocks. PENALOSA stated he was ultimately caught because he was bit by a spider and flinched which alerted the BPAs to his location.

38.    A later analysis of PENALOSA's cell phone revealed a contact listed as "Junior Godina" utilizing telephone number 619-962-7448. Subscriber/toll information for that telephone number identified the subscriber as GODINA Jr, Everardo; Address: 244 50th St Apt 5, San Diego, CA 92102.

39.    During his post-arrest interview at the Brown Field Border Patrol Station, Everardo GODINA identified a Black iPhone cell phone, IMEI: 352896113380567 (the **Target Telephone**) as his phone.  This phone was seized, and a warrant [21-MJ-3710] was subsequently obtained to search that phone on September 8, 2021. The warrant was executed, but the results provided were an undecipherable mixture of letters, signs and symbols, rather than the true data from the phone. According to agents trained in the forensic examinations of cellular phones, a second extraction, perhaps using different equipment, could produce the true data from the phone.

40.    During the course of the investigation, toll and local service records were obtained from the cellular service providers for the phones used by ARCHULETA (619-707-3894), Kayla Godina (619-707-3898), Everardo GODINA (619-962-7448)

14

1 and Jose PENALOSA (619-962-7416). Those records revealed that between September
2 5, 2021, and September 7, 2021, there were approximately 21 calls between
3 ARCHULETA and PENALOSA, including 5 calls after 7:00 p.m. on September 6,
4 2021, when they were on Otay Mountain. Less than an hour, and often within minutes
5 of the calls between ARCHULETA and PENALOSA, there were approximately 19
6 calls between Kayla Godina and Everardo GODINA. It should be noted that while they
7 were driving on Otay Mountain, Kayla Godina and ARCHULETA were seated together
8 in the front seat of the same vehicle. The phone records also showed approximately 72
9 calls between PENALOSA and GODINA, beginning on June 6, 2021, and ending on
10 September 2, 2021.

11 **METHODOLOGY**

12     41.    It is not possible to determine, merely by knowing the cellular telephone's
13 make, model and serial number, the nature and types of services to which the device is
14 subscribed, and the nature of the data stored on the device. Cellular devices today can
15 be simple cellular telephones and text message devices, can include cameras, can serve
16 as personal digital assistants and have functions such as calendars and full address books
17 and can be mini-computers allowing for electronic mail services, web services and
18 rudimentary word processing. An increasing number of cellular service providers now
19 allow for their subscribers to access their device over the internet and remotely destroy
20 all of the data contained on the device. For that reason, the device may only be powered
21 in a secure environment or, if possible, started in "flight mode" which disables access
22 to the network. Unlike typical computers, many cellular telephones do not have hard
23 drives or hard drive equivalents and store information in volatile memory within the
24 device or in memory cards inserted into the device. Current technology provides some
25 solutions for acquiring some of the data stored in some cellular telephone models using
26 forensic hardware and software. Even if some of the stored information on the device
27 may be acquired forensically, not all of the data subject to seizure may be so acquired.
28 For devices that are not subject to forensic data acquisition or that have potentially

15

1  relevant data stored that is not subject to such acquisition, the examiner must inspect
2  the device manually and record the process and the results using digital photography.
3  This process is time and labor intensive and may take weeks or longer.

4       42.    Following the issuance of this warrant, I will collect the subject cellular
5  telephone and subject it to analysis.  All forensic analysis of the data contained within
6  the telephone and the memory card will employ search protocols directed exclusively
7  to the identification and extraction of data within the scope of this warrant.

8       43.    Based on the foregoing, identifying and extracting data subject to seizure
9  pursuant to this warrant may require a range of data analysis techniques, including
10  manual review, and, consequently, may take weeks or months. The personnel
11  conducting the identification and extraction of data will complete the analysis within
12  ninety (90) days, absent further application to this court.

13       44.    Following the issuance of this warrant, I will collect the subject cellular
14  telephone and, with assistance, if necessary, from cellular telephone forensic examiners,
15  will attempt to securely power the device, identify whether it is protected by a personal
16  identification number (PIN), determine or circumvent the PIN and image or retrieve
17  data subject to seizure pursuant to this warrant from the device.   The search of the
18  device or of an image on the data on the device will be limited to identifying and seizing
19  data subject to seizure pursuant to this warrant and, in any event, will be limited to only
20  the information to be found on basic cellular telephones: digital, cellular, and/or
21  telephone numbers and/or direct connect numbers assigned to the device; call and direct
22  connect history information; list of contacts stored on the device; text messages stored
23  on the device; and, if equipped as a camera, photographs and videos stored on the
24  device.  In the event that I or other personnel lawfully conducting the analysis identify
25  information pertaining to crimes outside the scope of the warrant, such information will
26  not be used in any way unless a new warrant is obtained to search for such information.

27

28

16

45.     I, or any other duly authorized federal agent, will personally serve the warrant requested above, and will be assisted by other duly authorized federal investigators.

46.     Law enforcement has not previously attempted to obtain the evidence sought by this warrant, except as described herein.

## CONCLUSION

47.     Based on all the facts and circumstances described above, I believe that probable cause exists to conclude that GODINA used the **Target Telephone** to facilitate the offenses of alien smuggling or transportation, in violation of Title 8, United States Code, Section 1324, and conspiracy to commit alien smuggling or transportation, and to communicate with co-conspirators, ARCHULETA and PENALOSA.   The **Target Telephone** was likely used to facilitate the offense by transmitting and storing data, which constitutes evidence of Alien Smuggling or Transportation and Conspiracy to Commit Alien Smuggling or Transportation in violation of Title 8, United States Code, Section 1324.

48.     Because the **Target Telephone** was seized at the time of GODINA's arrest and has been securely stored since that time, there is probable cause to believe that such evidence continues to exist on the **Target Telephone**. As stated above, I believe the appropriate date range of this search is from June 1, 2021, through September 14, 2021.

49.     Based upon my experience and training, consultation with other agents in alien smuggling investigations, consultation with other sources of information, and the facts set forth herein, I know that the items to be seized set forth in Attachment B (incorporated herein) are likely to be found in the property to be searched described in Attachment A (incorporated herein).   Therefore, I respectfully request that the Court issue a warrant authorizing me, a USBP Agent, or another federal law enforcement agent specially trained in digital evidence recovery, to search the items described in Attachment A, and seize the items listed in Attachment B.

17

50.   I swear the foregoing is true and correct to the best of my knowledge and belief.

Manuel J. Cervantes
Border Patrol Agent
U.S. Border Patrol

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this _18th_ day of October 2022.

HONORABLE KAREN S. CRAWFORD
United States Magistrate Judge

18